Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 10, 2003        Decided April 11, 2003

No. 01-1493

MORE TRUCK LINES, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

On Petition for Review and Cross–Application
for Enforcement of an Order of the
National Labor Relations Board

———

*Lawrence J. Gartner* argued the cause for petitioner. With him on the briefs were *Betty Southard Murphy* and *Johnine P. Barnes*.

*David A. Seid*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

2

General Counsel, *Meredith L. Jason*, Supervisory Attorney, and *Kira Dellinger Vol*, Attorney. *Frederick L. Cornnell, Jr.*, Attorney, entered an appearance.

Before: RANDOLPH and ROGERS, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge.*

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge:* The issue in this petition for review of an order of the National Labor Relations Board is whether statements of More Truck Lines, Inc., that it would withhold wage increases from its employees if they elected a challenging union as their representative constituted threats in violation of § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1). The Board cross-petitions for enforcement.

More Truck Lines transports paving materials, rock, sand, and related equipment throughout southern California. On June 18, 1998, the company and the Brotherhood, a labor organization representing the company's full-time and regular part-time drivers, signed a collective-bargaining agreement, effective from July 1, 1998, through June 30, 2001. The agreement provided that each full-time driver who was already employed on the date the agreement went into effect would receive an annual $1 per hour raise to be implemented on the three anniversary dates of his hire falling within the term of the agreement, unless the driver already received the maximum wage.[1] The agreement further specified that each full-time driver hired after the agreement went into effect would receive a $1 per hour raise upon completing a three month probationary period, and would thereafter receive an

---

[1] The relevant part of the agreement read:

> Each regular full-time driver employed on the effective date of this agreement shall receive, on his or her first, second and third anniversary dates (anniversary date as used herein means the employee's date of hire) following the effective date of this Agreement, a $1.00 per hour increase provided that no driver shall receive an increase

additional $1 per hour increase on each of the anniversary dates of his hire occurring during the term of the agreement.[2]

On April 29, 1999, the Board's regional director conducted a representation election pursuant to a petition filed by the General Truck Drivers, Office, Food & Warehouse Union, Teamsters Local 952, International Brotherhood of Teamsters, AFL–CIO ("Teamsters").[3] The drivers had three choices: vote to be represented by the Teamsters, vote to be represented by the Brotherhood, or vote not to be represented. None of the three options received a majority of the votes. The regional director then scheduled a runoff election between the Teamsters and the Brotherhood to take place on May 20, 1999.

Between the April election and the May runoff, the company distributed three documents to its drivers. The first was a signed letter from the company's president, Dan Sisemore, and its operations manager, Bill Pyles. The letter stated:

> If the Teamsters win the election . . . [the company's] current contract with the Brotherhood becomes null and void. . . . No matter what the Teamsters have told you, if the Teamsters win and are certified, we by law can no longer give you the wage increases already bargained for in the Brotherhood contract because that contract will be null and void. In fact, the law would require that all wages, benefits and working

---

which places him or her above the top driver wage rate. . . .

[2] The agreement provided, in relevant part:

> Each regular full-time driver hired after the effective date of this Agreement shall be hired at a starting rate of $10.00 per hour. Following the successful completion of a 90–day probationary period, said employee shall receive a $1.00 per hour increase. Said employee shall thereafter be paid a $1.00 per hour increase on each of his/her anniversary dates falling within the term of this Agreement.

[3] The Teamsters filed the petition on September 25, 1997. The Board subsequently conducted an election, which the Teamsters won, but the Board set aside the result based upon the company's objections and scheduled a second election for April 29, 1999.

> conditions be frozen until we either reach agreement with the Teamsters on a contract or there is an impasse in the negotiations.

The second document was a flier on company letterhead. Quoting the Board's statement in *The Maramont Corp.*, 317 N.L.R.B. 1035, 1044 (1995), that "a contract … become[s] null and void" if a challenging union wins a representation election, the flier reiterated the company's position: "No matter what the Teamsters have told you, the law is clear: if the Teamsters win and is [sic] certified, [the company] by law, can no longer give you the wage increases already bargained for in the Brotherhood contract because that contract will be null and void." The third document was a copy of the Board's decision in *RCA Del Caribe, Inc.*, 262 N.L.R.B. 963 (1982), with the following passage underlined: "If the incumbent prevails in the election held, any contract executed with the incumbent will be valid and binding. If the challenging Union prevails, however, any contract executed with the incumbent will be null and void." *Id.* at 966.

In addition to these handouts, Pyles and Sisemore on separate occasions explained to drivers that if the Teamsters were elected, the drivers' wages would be frozen at their current levels because the Brotherhood contract would be null and void.

On May 6, 1999, the Teamsters filed unfair labor practice charges, alleging that the company had violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by threatening the drivers with adverse action if they elected the Teamsters. The May 20 runoff election nevertheless proceeded, and the Brotherhood won a majority of votes.

On October 27, 1999, the Board's general counsel, through the regional director, issued a complaint. An Administrative Law Judge found that the company violated § 8(a)(1) because the annual raises were terms and conditions of employment that the company would have to honor even after the Brotherhood contract became null and void. Thus, the company's statements that it would not implement the raises if the Teamsters won the election were unlawful threats.

The Board affirmed the ALJ's rulings, findings, and conclusions. By the time of the Board's decision—October 1, 2001—the collective-bargaining agreement had expired. Presumably, the company had granted the wage increases set forth in the agreement. The Board therefore did not issue a backpay order, but did adopt (with a clerical modification) the ALJ's order setting aside the May 20 runoff election, ordering a new runoff election, and requiring the company to cease and desist from threatening employees with the loss of negotiated wage increases if they elected the Teamsters. *More Truck Lines, Inc.*, 336 N.L.R.B. No. 69, at 3 (2001).

Section 7 of the National Labor Relations Act guarantees employees "the right . . . to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Section 8(a)(1) enforces § 7, making it an "unfair labor practice" for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" § 7. 29 U.S.C. § 158(a)(1). An employer who threatens employees with adverse action if they elect a particular union commits an unfair labor practice. *See Southwire Co. v. NLRB*, 820 F.2d 453, 457–58 (D.C. Cir. 1987).

The company says it merely informed its employees of what the Board had said in *RCA*—that a collective-bargaining agreement with an incumbent union becomes "null and void" if a challenging union is elected. Although an employer may in some circumstances avoid liability imposed for actions undertaken in good-faith reliance upon Board precedents, *see Clark–Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1081 (D.C. Cir. 1987) (en banc), the company's statements to its employees in this case went beyond the Board's *RCA* opinion. The company did not announce only that its contract with the Brotherhood would be void if the Teamsters won. It added that the "law" would preclude it from implementing the wage increases set forth in the contract. As the Board sees it, this last statement is not within *RCA*'s holding and is not an accurate reflection of an employer's legal obligation in these circumstances. The "null and void" language in *RCA*, the Board ruled, was intended to mean only "that a successful intervening union must be afforded an

opportunity to negotiate a new contract, rather than be saddled with the one entered into by the defeated incumbent." 336 N.L.R.B. No. 69, at 2.

The Act requires parties to negotiate in good faith over "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). The general rule is that an employer violates its bargaining obligation if it unilaterally alters wage rates, including automatic wage increases, unless it has bargained to an impasse. *See* 29 U.S.C. § 158(a)(5) & (d); *NLRB v. Katz*, 369 U.S. 736, 743 (1962); *Daily News of Los Angeles v. NLRB*, 73 F.3d 406, 410–11 (D.C. Cir. 1996). The obligation to continue the wage rates then in effect is not derived from the contract, but is imposed by the Act. *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206–07 (1991). Therefore, if a collective-bargaining agreement has expired, an employer may not unilaterally alter the wage rates that were set in the agreement.

The company here made a prediction about what would happen to the automatic wage increases if the incumbent union lost the runoff election. That situation, the Board ruled, would be analogous to one in which an existing collective-bargaining agreement expired: hence, the company would have to abide by the wage rates set forth in the "null and void" contract, including the annual raises, until it entered into a new agreement with the Teamsters or the bargaining reached an impasse. The Board's analogy is persuasive but not perfect. True, an expired contract is just as null as a contract that ends because of an incumbent union's ouster. But the expired-agreement situation differs in two respects: the employer is still dealing with the same union, and, one would expect, any wage increases set forth in the expired agreement already have been put into effect.

The company's objection is of another sort. It claims that the unilateral change doctrine does not apply because annual wage increases cease to be terms of employment when the collective-bargaining agreement becomes null and void. The argument is not well-taken. Terms and conditions of employment may continue in effect by operation of law even after an

employer is released from any contractual obligations. The Supreme Court so held in *Litton Financial Printing Division*, 501 U.S. at 206. *See also Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 25–27 (2d Cir. 1988). Here, since the Brotherhood agreement obligated the company to implement wage increases each year for the duration of the agreement, the Board reasonably concluded that those annual raises had become terms and conditions of employment and, accordingly, that the company's statements that it would not–could not–implement the raises if the Teamsters were elected constituted unlawful threats. *See Illiana Transit Warehouse Corp.*, 323 N.L.R.B. 111, 114, 118–19 (1997).

A caveat deserves mention. Under the collective-bargaining agreement, the drivers were to receive up to three annual wage increases during the three-year term of the agreement. After the contract's expiration date (June 30, 2001), there would be no further annual raises unless the parties negotiated a new agreement providing for them. The Board did not mention this detail and had no reason to do so. The Board rightly put its decision on the ground that the company threatened not to implement any raises if the Teamsters were elected on May 20, 1999—well before the agreement expired.

We therefore enforce the Board's order and deny the petition for review.

*So ordered.*