# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 21, 2017           Decided May 19, 2017

No. 15-1318

WILKES-BARRE HOSPITAL COMPANY, LLC, DOING BUSINESS
AS WILKES-BARRE GENERAL HOSPITAL,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

PENNSYLVANIA ASSOCIATION OF STAFF NURSES AND ALLIED
PROFESSIONALS,
INTERVENOR

———

Consolidated with 15-1384

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Kaitlin Kaseta* argued the cause for petitioner. With her
on the briefs was *Bryan T. Carmody*.

*Kellie J. Isbell*, Attorney, National Labor Relations Board,
argued the cause for respondent. On the brief were *Richard F.
Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate

General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Elizabeth Heaney*, Supervisory Attorney, and *Michael R. Hickson*, Attorney.

Before: PILLARD, *Circuit Judge*, and EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Petitioner Wilkes-Barre Hospital Company, LLC d/b/a Wilkes-Barre General Hospital (the "Hospital") petitions for review of the National Labor Relations Board's ("NLRB" or the "Board") decision and order finding that the Hospital violated section 8(a)(1) and (a)(5) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1), (5), by unilaterally ceasing the payment of longevity-based wage increases to its nurses after the expiration of the parties' collective bargaining agreement. *See generally Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190 (1991); *NLRB v. Katz*, 369 U.S. 736 (1962). The NLRB cross-applies for enforcement of its decision and order. The Hospital argues that the language of the agreement and the parties' shared understanding of that language demonstrate that the Hospital was not obligated to continue paying longevity-based increases upon expiration of the agreement. Relying on *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), the Hospital also challenges the NLRB Regional Director's authority to issue and prosecute the underlying complaint against the Hospital. For the reasons set forth below, we deny the Hospital's petition for review and grant the NLRB's cross-application for enforcement.

# I.

## *The Collective Bargaining Agreements*

Petitioner operates an acute care facility in Wilkes-Barre, Pennsylvania. The Hospital's full-time and part-time graduate and registered nurses are represented by the Pennsylvania Association of Staff Nurses and Allied Professionals, AFL-CIO (the "Union"). The Union is the exclusive collective bargaining representative for a bargaining unit of approximately 450 of the Hospital's nurses.

In or around May 2009, the Union negotiated with the new owner of the Hospital a memorandum of agreement that served as the parties' collective bargaining agreement through June 30, 2009 ("2009 CBA"). The 2009 CBA incorporated by reference certain terms of the prior collective bargaining agreement between the Hospital's former owner and the Union ("2005 CBA"), including Article 25, which provided nurses with annual across-the-board raises and longevity-based wage increases. After the 2009 CBA expired on July 1, 2009, the parties began negotiations but did not reach a successor collective bargaining agreement until April 30, 2011 ("2011 CBA"). Accordingly, the parties were without a collective bargaining agreement from July 1, 2009, to April 30, 2011. No wage increases, including the longevity-based increases, were paid to the nurses in January 2010 or January 2011.

In response to the Hospital's failure to pay longevity-based increases in January 2010, the Union filed an unfair labor practice charge with the NLRB's Regional Office. The NLRB's Regional Director dismissed the charge and the General Counsel upheld the dismissal. The Union did not file an unfair labor practice charge in connection with the

Hospital's failure to pay longevity-based increases in January 2011.

The 2011 CBA became effective on April 30, 2011, and expired on April 30, 2013. The new CBA, like the 2009 CBA, provides that a nurse's minimum base hourly rate would be determined by his/her experience level. The seven experience levels were grouped as follows: 0-2 years; 3-4 years; 5-9 years; 10-14 years; 15-19 years; 20-24 years; and 25+ years. Similar to the 2005 CBA and the 2009 CBA, Article 25 and Appendix A of the 2011 CBA provide for two types of wage increases: across-the-board raises and longevity-based increases.

Sections 1 through 3 of Article 25 describe the across-the-board raises, which were provided to nurses on three dates certain. After the 2011 CBA became effective on April 30, 2011, nurses received a catch-up increase in their base hourly rate in May 2011. Nurses then received a 2.75% increase in base hourly rate on January 27, 2012, and a further 2.00% increase on January 27, 2013.

Sections 4 and 5 of Article 25 provide for the longevity-based increases. Section 4 explains that wage minimums were "based upon the employee's length of continuous service as a registered nurse," and Section 5 states that longevity-based increases were to be paid on "January 27th of the year following the employee's anniversary date." Nurses received longevity-based increases as they advanced from one experience level to the next (*e.g.*, 0-2 years level to 3-4 years level), resulting in an increase in their hourly pay rate the following January 27th.

The initial wage scale and the subsequent increases during the term of the 2011 CBA were set forth in Appendix A in the

following chart showing minimum hourly wage rates for nurses in the seven experience levels:

**Appendix A**

**Wages (Article 25)**

During the term of this Agreement, the initial wage scale and subsequent applicable increases to same for bargaining unit RN's shall be in accordance with the following:

|  | Acute Care | | |  | Health Services | | |
|---|---|---|---|---|---|---|---|
|  | May, 2011 | January 2012 | January 2013 |  | May, 2011 | January 2012 | January 2013 |
| 0-2 | $24.90 | $25.58 | $26.10 |  | $19.54 | $20.08 | $20.48 |
| 3-4 | $25.76 | $26.47 | $27.00 |  | $20.10 | $20.65 | $21.07 |
| 5-9 | $26.55 | $27.28 | $27.83 |  | $21.04 | $21.62 | $22.05 |
| 10-14 | $27.87 | $28.64 | $29.21 |  | $22.14 | $22.75 | $23.20 |
| 15-19 | $28.74 | $29.53 | $30.12 |  | $22.68 | $23.30 | $23.77 |
| 20-24 | $29.17 | $29.97 | $30.57 |  | $23.20 | $23.84 | $24.31 |
| 25+ | $30.11 | $30.94 | $31.56 |  | $23.84 | $24.50 | $24.99 |

"Reading across, the chart shows the three annual across-the-board raises; reading down, the chart shows the longevity-based wage increases." *Wilkes-Barre Hosp. Co.*, 362 N.L.R.B. No. 148, at *4 (July 14, 2015).

*The Hospital's Failure to Pay Longevity-Based*
*Increases in 2014*

The parties began negotiations for a successor collective bargaining agreement in February 2013. The 2011 CBA expired on April 30, 2013, and the parties bargained without impasse through July 2014. Following the expiration of the 2011 CBA, the Hospital did not pay any wage increases in January 2014. The Hospital does not dispute that it neither gave the Union prior notice of its intention to cease paying longevity-based increases in 2014 nor afforded the Union the opportunity to bargain over that decision.

The Union filed charges with the NLRB's Regional Director, including its contention that the Hospital's failure to pay longevity-based increases in January 2014 violated section 8(a)(1) and (a)(5) of the Act. The Union did not assert that the nurses were entitled to additional across-the-board raises. The General Counsel, through Dennis P. Walsh, the Regional Director of Region 4, issued a consolidated complaint on April 23, 2014.

*The Board Proceedings and Order*

An administrative law judge considered charges that the Hospital violated section 8(a)(1) and (a)(5) by ceasing to pay longevity-based increases to nurses in January 2014. *See Wilkes-Barre Hosp. Co.*, Case 04-CA-123748, 2014 WL 6386518 (Nov. 17, 2014). The complaint charged that, under the rule first articulated in *NLRB v. Katz*, 369 U.S. 736 (1962), when the 2011 CBA expired, the Hospital had a statutory obligation to maintain the status quo as to its nurses' terms and conditions of employment. *See, e.g.*, *Honeywell Int'l, Inc. v. NLRB*, 253 F.3d 125, 127, 131 (D.C. Cir. 2001). The Hospital argued that, within the status quo, the longevity-based increases operated in tandem with the across-the-board raises. The Hospital further argued that the evidence established that past practice permitted it to pretermit the payment of the longevity-based increases after the expiration of the CBA.

The ALJ accepted the General Counsel's position that the across-the-board raises and the longevity-based increases were "distinct rights" that did not "go hand-in-hand" and found it "quite simple" for the Hospital to apply "the terms that already existed in the contract and grant[] hourly wage rate increases as specified in appendix A" after the agreement's expiration. She therefore concluded that the Hospital violated its statutory

duty to bargain by failing to pay longevity-based increases in January 2014.

She explained that the 2011 CBA did not include language either "specifically limiting the applicability of" the longevity-based increases to the term of the agreement or clearly and unmistakably waiving the nurses' statutory right to receive those increases. Thus, the ALJ held, the longevity-based increase provision "continue[d] in effect" after the agreement's expiration. She also rejected the Hospital's past practice argument, finding that the evidence did not establish that the parties had a longstanding practice of the Hospital's unilateral changes going unchallenged by the Union.

The Hospital also moved to dismiss on the ground that Director Walsh had been improperly appointed by an unconstitutionally constituted Board and therefore did not have the authority to issue the complaint upon which the proceeding was held. The ALJ denied this motion, citing the record fact that a later, lawfully constituted Board had ratified the Director's appointment. The NLRB summarily affirmed the ALJ's rulings, findings, and conclusions, and adopted her recommended order with slight modifications. *Wilkes-Barre Hosp.*, 362 N.L.R.B. No. 148, at *1.

The Hospital timely filed the present petition for review, and the NLRB filed a cross-application for enforcement. We have jurisdiction pursuant to 29 U.S.C. § 160(e), (f).

**II.**

Before considering the merits of the Board's order, we must address the threshold question raised by the Hospital's motion to dismiss. The Hospital argues that all the acts of

Regional Director Walsh were *ultra vires*, as his appointment was invalid. The NLRB had appointed him as Regional Director on March 10, 2013. In *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), the Supreme Court invalidated the recess appointments of three of the Board's five members. As a result, the Board lacked a valid quorum between January 2012 and August 2013. Therefore, argues the Hospital, Walsh had no authority to issue the complaints against it. *See ManorCare of Kingston PA, LLC v. NLRB*, 823 F.3d 81, 89 (D.C. Cir. 2016); *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 596 & n.1 (3d Cir. 2016).

While the Hospital's argument is correct in its basic assumptions, events have overtaken it since the initial invalidity of Walsh's appointment and his unlawful issuance of complaints. After the period of invalid Board operation recognized in *Noel Canning*, the President made valid appointments to create a quorum on the Board. The reconstituted Board ratified the appointment of Walsh as Director, among many other actions. Walsh, as Director, thereafter ratified his own prior invalid actions. Because both the Board and Director Walsh ratified the actions taken during the period in which the Board lacked a valid quorum, we conclude that the Hospital's motion was properly denied.

In general, "[r]atification occurs when a principal sanctions the prior actions of its purported agent." *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 212 (D.C. Cir. 1998), *superseded by statute on other grounds*, Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277, 122 Stat. 2681 (1998), *as recognized in SW Gen., Inc. v. NLRB*, 796 F.3d 67, 70–71 (D.C. Cir. 2015), *aff'd* 137 S. Ct. 929 (2017). Our precedents establish that ratification can remedy a defect arising from the decision of "an improperly appointed official . . . when . . . . a properly appointed official has the

power to conduct an independent evaluation of the merits and does so." *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 117–21, 124 (D.C. Cir. 2015) (citing *Doolin Sec.*, 139 F.3d at 213–14; *FEC v. Legi-Tech*, 75 F.3d 704, 708–09 (D.C. Cir. 1996)). Relevant to this case, we previously suggested that "a properly constituted Board" could ratify the decisions of an improperly constituted Board. *See Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469, 476 (D.C. Cir. 2009); *see also Allied Aviation Serv. Co. of N.J. v. NLRB*, ___ F.3d ___, 2017 WL 1379517, at *6 (D.C. Cir. 2017).

On July 18, 2014, after the Supreme Court's decision in *Noel Canning*, all five members of a properly constituted Board adopted and ratified "all administrative, personnel, and procurement matters approved by the Board or taken by or on behalf of the Board between January 4, 2012, and August 5, 2013," inclusive. *Wilkes-Barre Hosp.*, 362 N.L.R.B. No. 148, at *5. The Board expressly authorized Director Walsh's appointment, and Director Walsh affirmed and ratified his own actions in a separate order on July 30, 2014.

After considering relevant materials, the properly constituted Board expressly ratified its appointment of Director Walsh as a Regional Director. The Hospital presents no evidence to suggest that the Board failed "to conduct an independent evaluation of the merits," *Intercollegiate Broad.*, 796 F.3d at 117, or make "a detached and considered judgment," *Doolin Sec.*, 139 F.3d at 213, when it ratified Director Walsh's appointment. The Hospital argues that the Board's ratification was an improper attempt to "insulate the Board from the invalidity of the original appointments and the actions taken thereunder." This argument fails. Ratification can remedy defects arising from the decisions of improperly appointed officials. *See, e.g.*, *Intercollegiate Broad.*, 796 F.3d

at 117–18. Therefore, the properly constituted Board's ratification remedied any defect arising from the quorum violation.

Because he acted as "both the principal and the agent," the propriety of Director Walsh's ratification of his own actions presents a more difficult question. *See Advanced Disposal*, 820 F.3d at 602–03. After considering the applicable law and the facts of this case, we conclude that Director Walsh's ratification was sufficient to remedy the defect. As an initial matter, we note that the only evidence presented by the Hospital on the invalidity of Director Walsh's ratification is a memorandum from the Board's Office of Inspector General concluding that probable cause existed to find that Director Walsh violated the Standards of Ethical Conduct for Employees of the Executive Branch by participating in certain prohibited fundraising activities. As the violation is unrelated to the Hospital or Director Walsh's issuance of complaints during the period in which the Board lacked a quorum, we fail to see the relevancy of this information to the question presented in this case.

The Hospital's primary argument is that Director Walsh's "self-ratification" was improper because "human nature" makes it impossible for an individual to be disinterested in his own prior decision-making. Although we have not been confronted with this precise situation, our precedents shed some light on the question. In *Doolin Security*, for example, we applied our ratification precedents even though the situation was "not easily characterized as between a principal . . . and an agent." *See* 139 F.3d at 213–14. We further explained in *Legi-Tech* that, "given human nature," forcing a properly appointed official to start at the beginning of the process does not necessarily promise a "more detached and 'pure' consideration of the merits of the case . . . ." 75 F.3d at 709.

We note that other circuits have held that ratification can be effective even where the same party is both the agent and the principal. In *Advanced Disposal*, the Third Circuit considered the question in a context so directly parallel to the present case that the same Director Walsh was the agent/principal in both. *See* 820 F.3d at 602–03. Citing our decision in *Doolin Security*, and analyzing the question that lingers, the Third Circuit ruled that Director Walsh's filing of a complaint necessarily affirmed the validity of his earlier action. *Id.* at 605.

Similarly, in *CFPB v. Gordon*, 819 F.3d 1179 (9th Cir. 2016), the Ninth Circuit considered the effect of the CFPB Director's ratification of his own prior invalid actions. *See id.* at 1185–86, 1190–91. The Director, like the NLRB in the case before us, was serving under an unconstitutional recess appointment at the time he made the initial actions. That circuit, relying on our decision in *Legi-Tech*, concluded that "even if the subsequent . . . 'review' was 'nothing more than a rubberstamp,'" it "resolve[d] any Appointments Clause deficiencies." *See id.* at 1191–92 (quoting *Legi-Tech*, 75 F.3d at 709); *see also Intercollegiate Broad.*, 796 F.3d at 118 & n.1 (suggesting that ratification may be sufficient even if the subsequent decision rubberstamped the previous decision).

In this case, the Hospital presented no evidence suggesting that Director Walsh failed to make a detached and considered judgment or that he was "actually biased" against the Hospital. *Legi-Tech*, 75 F.3d at 709. It also appears that forcing Director Walsh to reissue the complaint in this case would likely "do nothing but give the [Hospital] the benefit of delay." *See Doolin Sec.*, 139 F.3d at 214. We also note that the Hospital has failed to assert any "continuing prejudice" from the violation. *See Legi-Tech*, 75 F.3d at 708–09. Consistent with

precedent, we conclude that "the better course" is to take his ratification "at face value and treat it as an adequate remedy." *Id.* at 709. In short, the bare fact that Director Walsh ratified his own actions, without more, does not make his ratification insufficient. In any event, it is the General Counsel who has final authority over the issuance of complaints, *see* 29 U.S.C. § 153(d), and Director Walsh was acting on behalf of General Counsel Richard Griffin, who had been duly confirmed when the complaint against the Hospital issued on April 23, 2014. We conclude that Director Walsh's ratification of his own action remedied the defect in his original issuance of the complaint. We therefore proceed to review the merits of the petition.

## III.

## A.

Our review of the Board's unfair labor practice determination is limited. *Brewers & Maltsters, Local Union No. 6 v. NLRB*, 414 F.3d 36, 42 (D.C. Cir. 2005). "We . . . must sustain the Board's decision unless, reviewing the record as a whole, it appears that the Board's factual findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts at issue." *S. Nuclear Operating Co. v. NLRB*, 524 F.3d 1350, 1355 (D.C. Cir. 2008) (citation and internal quotation marks omitted). We also defer to the Board's reasonable construction of section 8(a)(5) and (d), 29 U.S.C. § 158(a)(5), (d). *See Brewers & Maltsters*, 414 F.3d at 41–42.

While the Board has authority to interpret collective bargaining agreements to resolve unfair labor practice charges, *NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 837 (D.C. Cir. 1993), we owe "no deference to the Board's interpretation of a

disputed collective bargaining agreement," *Commonwealth Commc'ns, Inc. v. NLRB*, 312 F.3d 465, 468 (D.C. Cir. 2002). Federal courts, not the Board, are the primary source of authority in interpreting collective bargaining agreements. *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 202–03 (1991); *Enloe Med. Ctr. v. NLRB*, 433 F.3d 834, 837–38 (D.C. Cir. 2005); *see also Chicago Tribune Co. v. NLRB*, 974 F.2d 933, 937–38 (7th Cir. 1992) ("The Board is not an expert in contract interpretation."). We therefore interpret the 2011 CBA *de novo*. *See Postal Serv.*, 8 F.3d at 837. When interpreting a collective bargaining agreement, we generally apply "ordinary principles of contract law." *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015).

**B.**

*The Unilateral Change Doctrine*

"Section[] 8(a)(5) and 8(d) of the [Act] require parties in a collective bargaining relationship to negotiate in good faith over 'wages, hours, and other terms and conditions of employment.'" *Daily News of L.A. v. NLRB*, 73 F.3d 406, 410 (D.C. Cir. 1996) (quoting 29 U.S.C. § 158(d)); *see also* 29 U.S.C. § 158(a)(5). Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with its employees' exercise of their rights under the Act. 29 U.S.C. § 158(a)(1). Thus, an employer's violation of section 8(a)(5)'s duty to bargain also violates section 8(a)(1). *Enter. Leasing Co. of Fla. v. NLRB*, 831 F.3d 534, 546 (D.C. Cir. 2016).

"The Board has taken the position that it is difficult to bargain if, during negotiations, an employer is free to alter the very terms and conditions that are the subject of those negotiations." *Litton Fin.*, 501 U.S. at 198. Indeed, the Supreme Court has equated an employer's unilateral change to

terms and conditions of employment to "a flat refusal" to bargain. *NLRB v. Katz*, 369 U.S. 736, 743 (1962). Accordingly, absent impasse or waiver, an employer violates *both* section 8(a)(1) and (a)(5) by unilaterally changing terms and conditions of employment. *Honeywell Int'l, Inc. v. NLRB*, 253 F.3d 125, 127, 131 (D.C. Cir. 2001) (citing *Litton Fin.*, 501 U.S. 190; *Katz*, 369 U.S. 736). This "unilateral change doctrine" extends to cases "where, as here, an existing agreement has expired and negotiations on a new one have yet to be completed." *Id.* at 127–28 (quoting *Litton Fin.*, 501 U.S. at 198); *see also More Truck Lines, Inc. v. NLRB*, 324 F.3d 735, 738–39 (D.C. Cir. 2003); *Sw. Steel & Supply, Inc. v. NLRB*, 806 F.2d 1111, 1113 (D.C. Cir. 1986).

### *Status Quo under the 2011 CBA*

To avoid running afoul of the unilateral change doctrine, an employer must maintain the status quo as to terms and conditions of employment after the expiration of a collective bargaining agreement. *See Laborers Health & Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 543–44 nn.5–6 (1988). The primary dispute in this case concerns the proper determination of the post-expiration status quo. Because an employer's obligation to maintain the status quo derives from the Act, not from the agreement, *see More Truck Lines*, 324 F.3d at 738-39; *Honeywell Int'l*, 253 F.3d at 128, 131, certain terms of an expired agreement extend beyond the agreement's expiration and continue to "define the status quo," *Litton Fin.*, 501 U.S. at 206 (emphasis omitted). Otherwise put, the unilateral change doctrine requires employers "to honor the terms and conditions of an expired collective-bargaining agreement." *Laborers Health & Welfare Trust Fund*, 484 U.S. at 544 n.6. In defining the post-expiration status quo in this case, therefore, we look to the substantive terms of the 2011 CBA. *See NLRB v. Cauthorne*, 691 F.2d

1023, 1025 (D.C. Cir. 1982); *E.I. Du Pont De Nemours*, 364 N.L.R.B. No. 113, at *5 (Aug. 26, 2016); *see also Intermountain Rural Elec. Ass'n v. NLRB*, 984 F.2d 1562, 1567 (10th Cir. 1993) (noting that "the contract language itself . . . defines the [post-expiration] status quo").

In considering an unfair labor practice charge premised on the unilateral change doctrine, "the relevant inquiry . . . is whether any established employment term on a mandatory subject of bargaining has been unilaterally changed." *Daily News*, 73 F.3d at 411. In this case, the longevity-based wage increase provision was a mandatory subject of bargaining, *see* 29 U.S.C. § 158(d); *More Truck Lines*, 324 F.3d at 738–39, and an established term of the 2011 CBA that survived the agreement's expiration. It is undisputed that the parties did not bargain to lawful impasse and that the Hospital did not notify the Union of its intention to cease paying longevity-based increases. Accordingly, upon expiration of the 2011 CBA, the Hospital was obligated to continue paying longevity-based increases absent lawful impasse or a new agreement with the Union. *See Honeywell Int'l*, 253 F.3d at 127–28, 131–32.

The Hospital counters that the longevity-based increases were paid "exclusively in conjunction with" the across-the-board raises, which were expressly limited to the term of the agreement and thus cannot define the post-expiration status quo. The Hospital argues that during the term of the agreement, nurses were given a single wage rate increase on each of three specific dates consisting of a combination of an across-the-board raise and a longevity-based increase, if applicable. According to the Hospital, therefore, cessation of *all* wage increases represents the post-expiration status quo. The Hospital's argument misses the mark.

In essence, the Hospital seeks to define the status quo by taking a snapshot of each individual nurse's pay rate at the moment the 2011 CBA expired. But the terms of the expired agreement define the post-expiration status quo, *see, e.g.*, *Litton Fin.*, 501 U.S. at 206; *Sw. Steel*, 806 F.2d at 1113, not each individual employee's circumstance at the time of expiration, *see Daily News*, 73 F.3d at 409, 412–13 (stating that employer must continue merit-increase program after the agreement's expiration even though the increases were "discretionary as to the precise amount").

The 2011 CBA, through its language and structure, establishes two distinct types of wage increases: across-the-board raises and longevity-based increases. Sections 1, 2, and 3 of Article 25 set forth the across-the-board raises. These raises resulted in a percentage increase in each nurse's base minimum hourly rate and were provided to all of the Hospital's nurses on three specific dates during the term of the agreement. Sections 4 and 5 of Article 25 provide for the longevity-based increases, which were paid to individual nurses who advanced from one experience level to the next. The longevity-based increases, unlike the across-the-board raises, were tied to an individual nurse's anniversary date, not to the term of the agreement. Specifically, the agreement states that longevity-based increases were to be paid on "January 27th of the year following the employee's anniversary date." Thus, as the Board held, the across-the-board raises and longevity-based increases were "distinct rights," and nurses had a continued "right to wage rate increases when they advanced to the next experience level." *Wilkes-Barre Hosp.*, 362 N.L.R.B. No. 148, at *7.

The Hospital argues that the chart in Appendix A illustrates the interplay between the two wage increases, asserting that the chart combines the five wage sections in

Article 25 "into one, singular wage increase table." Appendix A, however, does not support the Hospital's contention. As the Board explained: "Reading across, the chart shows the three annual across-the-board raises; reading down, the chart shows the longevity-based wage increases." *Id.* at *4. It is undisputed that the wage rates included in the chart froze at the January 2013 levels upon the agreement's expiration, meaning that nurses were not entitled to an across-the-board raise in their base minimum hourly rates in January 2014. Although the wage rates froze, each individual nurse could still move up the steps of the chart based on his/her experience level until a new agreement or lawful impasse was reached. Appendix A therefore reflected the nurses' ongoing right to receive post-expiration longevity-based increases, as set forth in Sections 4 and 5 of Article 25. We agree with the Board that when a nurse reached one of the milestone work anniversaries, "the longevity-based scale at appendix A" can easily be applied without any "concomitant across-the-board raises." *Id.* at *7.

The Hospital also directs our attention to the language accompanying the chart, which explains that the wage scale and subsequent wage increases set forth in the 2011 CBA applied "[d]uring the term of th[e] Agreement." This durational clause, the Hospital argues, removed any uncertainty as to whether longevity-based increases survived the 2011 CBA's expiration. But the durational clause in Appendix A speaks to the nurses' contractual rights, not to their statutory rights. *See, e.g.*, *Litton Fin.*, 501 U.S. at 207 (noting "the distinction between contractual obligations and postexpiration terms imposed by the [Act]"). Without more, such a general durational clause cannot defeat the unilateral change doctrine. *See Honeywell Int'l*, 253 F.3d at 128, 132–33.

The Hospital makes a secondary argument based on the past practice of the parties to the 2011 CBA. An employer may implement unilateral changes to terms and conditions of employment when such changes are in line with its longstanding practice. *See E.I. Du Pont De Nemours & Co. v. NLRB*, 682 F.3d 65, 67–70 (D.C. Cir. 2012); *Int'l Bhd. of Elec. Workers Local 1466 v. NLRB*, 795 F.2d 150, 153 (D.C. Cir. 1986). Rather than constitute an unlawful unilateral change, an action taken pursuant to an established practice actually preserves the status quo. *See Katz*, 369 U.S. at 746; *E.I. Du Pont*, 682 F.3d at 67–68; *see also Aaron Bros. Co. v. NLRB*, 661 F.2d 750, 753 (9th Cir. 1981) ("Wage changes that merely reflect continuations of past company policy are not considered changes in existing work conditions, and thus fall outside the *Katz* rule."). To support its past practice argument, the Hospital points to the Union's failure to file an unfair labor practice charge in connection with the Hospital's non-payment of longevity-based increases in January 2011, after the expiration of the 2009 CBA. But a union's one-time failure to challenge an employer's unilateral change does not qualify as an established practice. *See Brewers & Maltsters*, 414 F.3d at 45.

In conclusion, the terms of the 2011 CBA establish that the payment of longevity-based increases represents the post-expiration status quo between the Hospital and the Union.

### The Contract Coverage Doctrine and Waiver

Having concluded that the Act "does not shield" the Hospital's unilateral decision to cease payment of longevity-based increases, we turn to the Hospital's argument that the Union "surrendered the[] right to bargain over the . . . change[] through either waiver or contract." *S. Nuclear Operating*, 524 F.3d at 1357. First, invoking the "contract

coverage doctrine," the Hospital asserts that the parties agreed in the 2011 CBA that the payment of *all* wage increases would cease upon the expiration of the agreement. Second, the Hospital contends that it demonstrated that the Union clearly and unmistakably waived the nurses' right to post-expiration longevity-based increases. We reject both arguments.

There are important distinctions between the contract coverage doctrine and waiver—a point we have repeatedly stressed. *See generally Heartland Plymouth Court MI, LLC v. NLRB*, 838 F.3d 16 (D.C. Cir. 2016). Because "the question of contractual coverage, one of contractual interpretation, is antecedent to the waiver question," *id.* at 19 n.1, we first consider whether the Hospital's decision to cease paying longevity-based increases was covered by the 2011 CBA.

The duty to bargain does not prevent a union from "exercis[ing] its right to bargain about a particular subject by negotiating for a provision in a collective bargaining contract that fixes the parties' rights and forecloses further mandatory bargaining as to that subject." *Postal Serv.*, 8 F.3d at 836 (quoting *Local Union No. 47, Int'l Bhd. of Elec. Workers v. NLRB*, 927 F.2d 635, 640 (D.C. Cir. 1991)); *see also S. Nuclear Operating*, 524 F.3d at 1358. Thus, pursuant to the contract coverage doctrine, an employer is "free to make unilateral changes . . . without running afoul of the Act" when those changes are "covered by the collective bargaining agreement." *Enter. Leasing*, 831 F.3d at 547 (citations and internal quotation marks omitted).

A dispute regarding a subject that is "covered by" a collective bargaining agreement presents "an issue of contract interpretation," *Bath Marine Draftsmen's Ass'n v. NLRB*, 475 F.3d 14, 23 (1st Cir. 2007) (citing *Postal Serv.*, 8 F.3d at 836–37), and when parties negotiate for a contractual provision

limiting the union's statutory rights, "we will give full effect to the plain meaning of such provision," *Local Union No. 47*, 927 F.2d at 641; *see also Postal Serv.*, 8 F.3d at 836 ("[T]he courts are bound to enforce lawful labor agreements as written . . . ."). Importantly, a subject may be covered by an agreement even if the agreement does not clearly and unmistakably address that particular subject. *See Enloe Med.*, 433 F.3d at 837–38; *Postal Serv.*, 8 F.3d at 838; *Connors v. Link Coal Co.*, 970 F.2d 902, 906 (D.C. Cir. 1992); *Local Union No. 47*, 927 F.2d at 641. Accordingly, in analyzing whether the Hospital's decision to cease paying longevity-based increases upon the expiration of the 2011 CBA was covered by that agreement, we consider whether that subject was "within the compass of" the terms of the agreement. *Postal Serv.*, 8 F.3d at 838.

We begin by noting that the Board improperly collapsed the contract coverage and waiver questions. The Board found that the 2011 CBA did not "specifically limit[]" the applicability of the longevity-based increases to the agreement's term or clearly and unmistakably waive the Union's statutory rights. *Wilkes-Barre Hosp.*, 362 N.L.R.B. No. 148, at *6. In determining whether an employer's unilateral decision is covered by a collective bargaining agreement, we consistently have rejected the Board's attempts to require the agreement to "specifically mention," *Enloe Med.*, 433 F.3d at 839, "specifically refer[]" to, *Postal Serv.*, 8 F.3d at 838, or "specifically address," *Connors*, 970 F.2d at 906, that decision. As we previously explained, the Board's approach fails to recognize that "bargaining parties [cannot] anticipate every hypothetical grievance and purport to address it in their contract," *Postal Serv.*, 8 F.3d at 838, and "imposes an artificially high burden on an employer," *Enloe Med.*, 433 F.3d at 837.

Nevertheless, after reviewing the terms of the 2011 CBA, we conclude that the Hospital's decision to cease paying longevity-based increases after the agreement's expiration is not covered by the agreement. The Hospital argues that, because the 2011 CBA expressly limited the across-the-board raises to the term of the agreement, the agreement necessarily limited the Hospital's statutory obligation to pay longevity-based increases to the term of the agreement as well. As explained above, however, the across-the-board raises and the longevity-based increases are distinct rights that operate independently of each other. And unlike the across-the-board raises, the longevity-based increases were "not limited to a time certain." *See Honeywell Int'l*, 253 F.3d at 128, 132–33. The durational clause in Appendix A, which stated that the initial wage scale and subsequent wage increases applied "[d]uring the term of th[e] Agreement," does not change this conclusion. Because the unilateral change doctrine "presupposes the end of a collective bargaining agreement," the standard durational clause in Appendix A, without more, cannot "'cover[]' and [thereby] vitiate[] [the] Union's *statutory* claim to continued" longevity-based increases. *See id.* at 128, 132–33. We therefore conclude that the Hospital's decision to cease paying longevity-based increases in January 2014 is not covered by the terms of the 2011 CBA.

The Hospital also argues that the Union clearly and unmistakably waived the nurses' statutory right to receive longevity-based increases after the expiration of the 2011 CBA. "A waiver occurs when a union knowingly and voluntarily relinquishes its right to bargain about a matter . . . ." *Postal Serv.*, 8 F.3d at 836 (citation and emphasis omitted). By waiving the right to bargain over a particular matter, a union "surrenders the opportunity to create a set of contractual rules that bind the employer, and instead cedes full discretion to the employer on that matter." *S. Nuclear Operating*, 524 F.3d at

1357 (citation and internal quotation marks omitted). It follows that "an employer's unilateral change to contract terms on that subject does not violate the Act." *Enter. Leasing*, 831 F.3d at 546. For this reason, unlike the contract coverage doctrine, a waiver "must be 'clear and unmistakable.'" *Honeywell Int'l*, 253 F.3d at 133 (quoting *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 703 (1983)).

In determining whether the Union waived its statutory rights, we consider the language of the 2011 CBA as well as the parties' course of conduct. *See S. Nuclear Operating*, 524 F.3d at 1357–58; *Honeywell Int'l*, 253 F.3d at 133–34. An employer bears the burden of showing that a union clearly and unmistakably waived its statutory rights. *Sw. Steel*, 806 F.2d at 1114–15. To satisfy its burden, the Hospital must establish that the parties "consciously explored or fully discussed the matter on which the union has consciously yielded its rights." *S. Nuclear Operating*, 524 F.3d at 1357–58 (citation and internal quotation marks omitted).

The Hospital contends that the language of the 2011 CBA establishes that the Union clearly and unmistakably waived the nurses' right to post-expiration longevity-based increases. "[G]enerally speaking, waivers of statutory rights must be demonstrated by an express statement in the contract to that effect." *Gannett Rochester Newspapers v. NLRB*, 988 F.2d 198, 203–04 (D.C. Cir. 1993) (citations, internal quotation marks, and alteration omitted). Consequently, employers cannot rely on contractual silence. *Id.* at 203; *S-B Mfg. Co.*, 270 N.L.R.B. 485, 490 (1984). Nor can "general contractual provision[s]," *Gannett Rochester*, 988 F.2d at 203, or "[e]quivocal, ambiguous language in a bargaining agreement," *NLRB v. Gen. Tire & Rubber Co.*, 795 F.2d 585, 588 (6th Cir. 1986), meet that standard. We also have noted that when a particular subject is not "covered by" a collective bargaining

agreement, that agreement generally will not "clearly and unmistakably waive bargaining over that matter." *Heartland Plymouth*, 838 F.3d at 26. This case is no exception.

The Hospital fails to identify any express language in the 2011 CBA to support its waiver defense, arguing instead that the agreement's language does not affirmatively "point to an ongoing statutory obligation" to pay longevity-based increases. The Hospital's argument fails to consider that, pursuant to the unilateral change doctrine, wage rates established in a collective bargaining agreement continue in effect "even after an employer is released from any contractual obligations." *See More Truck Lines*, 324 F.3d at 738–39; *see also Honeywell Int'l*, 253 F.3d at 134. Moreover, as noted above, the 2011 CBA's silence on the Hospital's statutory obligation to continue paying longevity-based increases after the agreement's expiration as part of the status quo is insufficient to establish waiver. *Gannett Rochester*, 988 F.2d at 203. While a contract duration clause that expressly authorizes the employer to terminate its statutory obligations upon expiration is sufficient to establish waiver, *see Local Joint Exec. Bd. of Las Vegas v. NLRB*, 540 F.3d 1072, 1080–82 (9th Cir. 2008); *Honeywell Int'l*, 253 F.3d at 133–34; *Staffco of Brooklyn, LLC*, 364 N.L.R.B. No. 102, at *2–4 & n.8 (Aug. 26, 2016), the 2011 CBA does not contain such a clause. The durational clause in Appendix A "makes it clear that the Union's *contractual* right" to longevity-based increases ended on April 30, 2013, but it "is silent on the Union's [post-expiration] *statutory* rights." *Honeywell Int'l*, 253 F.3d at 134. Accordingly, the durational clause "in no way evinces a clear and unmistakable waiver by the Union." *Id.*

The Hospital also fails to establish through "other contextual factors" that the Union waived the nurses' statutory right to longevity-based increases. *See Regal Cinemas, Inc. v.*

*NLRB*, 317 F.3d 300, 312–14 (D.C. Cir. 2003). The record does not reveal any evidence concerning the parties' bargaining history. Instead, the Hospital once again relies on the Union's failure to bring an unfair labor practice charge in January 2011, arguing that this failure illustrates that the parties agreed that the Hospital could cease the payment of longevity-based increases upon expiration. But the Union's one-time failure to challenge the Hospital's cessation of longevity-based increases in January 2011 "does not estop subsequent assertion of that right." *S. Nuclear Operating*, 524 F.3d at 1358; *see also Brewers & Maltsters*, 414 F.3d at 45. We note that the Supreme Court has held that two instances of a union's silence did not "establish a pattern of decisions clear enough to convert the union's silence into binding waiver." *See Metro. Edison*, 460 U.S. at 707–10. In sum, nothing in the record establishes that the Union fully discussed the nurses' right to receive longevity-based increases after the 2011 CBA's expiration and then "voluntarily relinquished [its] right to bargain over them." *S. Nuclear Operating*, 524 F.3d at 1358.

\* \* \*

For the reasons stated, we conclude that the Hospital violated section 8(a)(1) and (a)(5) by unilaterally ceasing the payment of longevity-based wage increases to nurses after the expiration of the parties' collective bargaining agreement. Accordingly, we deny the Hospital's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*