# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 18, 2015          Decided February 5, 2016

No. 11-1267

ALDEN LEEDS, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1245,
INTERVENOR

———

Consolidated with 11-1296

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Joseph B. Fiorenzo* argued the cause and filed the briefs for petitioner.

*Jeffrey W. Burritt*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

*Patricia McConnell* and *Jessica D. Ochs* were on the brief for intervenor United Food and Commercial Workers Local 1245 in support of respondent.

Before: TATEL, *Circuit Judge*, and EDWARDS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Petitioner Alden Leeds, Inc. ("Alden Leeds" or "the Company"), seeks review of a Decision and Order issued by the National Labor Relations Board ("NLRB" or "the Board") on July 19, 2011. The Board has filed a cross-application for enforcement. The United Food and Commercial Workers Union Local 1245 ("the Union"), the charging party before the Board, has intervened in support of the Board.

The Board found that Alden Leeds had violated Sections 8(a)(1) and (3) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 158(a)(1), (3), by locking out its employees on November 3, 2009, without providing the employees with a timely, clear, and complete offer setting forth the conditions necessary to avoid the lockout. *Alden Leeds, Inc.*, 357 N.L.R.B. No. 20 (July 19, 2011). Alden Leeds claims that substantial evidence in the record does not support the Board's finding that the Company committed the cited unfair labor practices. Alden Leeds also argues that, even if the lockout was unlawful, the Board erred in declining to allow the Company to attempt to establish in a separate compliance proceeding that its backpay liability ended on November 9, 2009.

We hold that, on the record before us, there is substantial evidence to support the Board's finding that Alden Leeds violated the Act by locking out its employees on November 3, 2009. Therefore, we deny the Company's petition for review on this issue and grant the Board's cross-application for enforcement.

We have no jurisdiction to consider the Company's claim that the Board erred in precluding it from litigating its backpay liability in a compliance proceeding. Alden Leeds failed to raise this issue before the Board in the first instance, as required by Section 10(e) of the Act. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."). There are no "extraordinary circumstances" here which give the court jurisdiction to address this matter.

## I.  BACKGROUND

Petitioner Alden Leeds manufactures and packages swimming pool cleaning supplies and chemicals at two locations in New Jersey. The Company employs approximately fifty production and delivery employees, who have been represented by the Union since 2001. In September 2009, Alden Leeds and the Union commenced negotiations on a new contract to succeed their 2005 collective bargaining agreement, which was set to expire on October 3, 2009. The Union sought increases in wages, sick days, and vacation days; changes in seniority; and a three-year agreement. The main sticking point between the parties was health care. Premiums were set to increase under the existing health care plan, and the Company and Union disagreed over how to apportion the increases.

The parties' first bargaining session was on September 30, 2009. At that meeting, Tom Cunningham, the Union's business agent, went through the Union's proposals and explained that the Union was seeking to keep its existing health care plan, which would necessitate increased contributions from the Company. Mark Epstein, the Company's president and chief executive officer, informed Cunningham that the Company was not going to agree to the health care contribution increases the Union was seeking. Nonetheless, Epstein told Cunningham that he was going to explore alternative health care plans with the Company's insurance broker.

The next meeting between the parties took place on October 5. Epstein provided Cunningham with descriptions of several alternative health care plans that had been prepared by the Company's broker. Cunningham stated that the plans would not work for the Union employees, as the deductibles and out-of-pocket costs were very high. Epstein responded that the Company's broker would look into other health care plans that might be more affordable for the employees. Cunningham then attempted to discuss the Union's other contract proposals, but Epstein interjected that he "couldn't do anything" with the other proposals, and that all the Company wanted was "a freeze for one year." *Alden Leeds, Inc.*, 357 N.L.R.B. No. 20, at 3. Cunningham responded that the Union would not agree to such a deal because the Company's current health care contributions would not sustain medical coverage for the year. Epstein repeated that he would furnish Union officials with additional health care plans for their consideration.

On October 8, the Company and the Union met again. At this meeting, Epstein stated that he was still trying to obtain

some additional health care plan proposals to provide the Union. Epstein also repeated that the Company wanted to extend the current contract for one year with a one-year "freeze." *Id.* at 4. However, Epstein informed the Union that he expected to have information on some additional health care plans by the next week. The parties signed an agreement at their October 8 meeting extending the 2005 collective bargaining agreement until November 2.

On October 21, Epstein emailed Cunningham an additional health care plan for the Union to review. Epstein also indicated that he "hoped to have something even better" and that he would advise the Union if anything came through. *Id.* at 5. The next day, on October 22, Epstein emailed Cunningham an analysis of the health care plan that the Company had provided to the Union the day before. Epstein explained that the cost of the plan would be more expensive than the existing plan, but less expensive than the Union's proposed renewal. Alternatively, Epstein suggested that if the Company provided employee-only coverage and eliminated family coverage, the cost would drop below the existing plan and the company could pay $400 towards each employee's deductible. Epstein ended his email by reiterating that he hoped to have something better later that day and, if so, he would forward it to the Union.

Later on October 22, Epstein emailed Cunningham yet another health care plan. He explained that, although the cost was similar to the plan that he had provided the day before and the deductible was higher, employees would not be required to provide their medical histories in order to secure coverage. Cunningham showed these plans to the Union's secretary treasurer, John Troccoli. Cunningham told Troccoli that he was not really sure what the Company was proposing

on health care and that the Company had made no proposal dealing with the Union's other issues.

On October 30, Troccoli telephoned Epstein and informed him that the Union did not think any of the Company's proposed health care plans would work because the deductibles were too high, medical reviews were required, and the cost to employees would be too high. As a concession, the Union offered the Company a continuation of the existing health care plan for one year at the same contribution levels. Troccoli requested that the parties go forward and discuss the other outstanding issues. Epstein replied, "You don't understand. I just want to keep everything the same. I don't want to pay anything more. . . . I want to keep everything the same for one year." *Id.* at 6 (ellipsis in original). Troccoli responded that the Union was willing to do that with health care, but wanted to discuss the other outstanding issues. Epstein repeated that he wanted to keep everything the same for one year, and that the Union employees were supposed to vote on the Company's offer. Troccoli responded, "Vote on what? I have no idea what we're voting on." *Id.* Epstein stated that if the employees did not vote and agree to the Company's offer, the employees would be locked out. Troccoli repeated that he did not know what the Union employees were supposed to be voting on. Epstein replied that the Union would have something by the end of the day.

Later that day, Epstein sent an email to the Union, which stated:

> During the 30 days since the Agreement between the parties expired we at the Company have tried our best to come up with an alternative medical plan that would cost the same or less than the proposed increase for the Union

plan. Our best efforts resulted in a plan that 1) requires medical interview for coverage 2) does not include dental 3) does not include optical 4) did not cost less than the expiring plan. However if we were to eliminate the family coverage and go to single coverage for all Union members then this plan would cost less than the expiring Union plan. There would be enough of a savings that the Company would provide $400 to each member to go toward their deductibles. . . . If we have no Agreement between the parties by the close of business on Monday then the Company will lock out the Union members on Tuesday morning Nov 3, 2009.

*Id.* Union officials made no effort to contact Epstein regarding his email. At 4 p.m. on November 2, Epstein informed the Union that, effective immediately, the employees were locked out. On November 3, the Union employees attempted to punch in at work but were prevented from doing so by the Company.

The parties met on November 3, 4, and 9. At the meeting on November 9, the Company presented the Union with a document entitled "Final Offer." *Id.* at 8. In its "Final Offer," the Company specified the health care plan that would be provided to employees and the contribution rates for both employees and the Company. The "Final Offer" further stated that all other terms of the 2005 collective bargaining agreement would remain in full force and effect. On November 12, the Union rejected the Company's "Final Offer."

## II. THE PROCEEDINGS BEFORE THE BOARD

The Union filed unfair labor practice charges against the Company. Thereafter, the Board's Regional Director issued a complaint and notice of hearing, alleging, *inter alia*, that Alden Leeds violated Sections 8(a)(1), (3), and (5) of the Act by unlawfully locking out its employees. On August 30, 2010, following a hearing, an Administrative Law Judge ("ALJ") concluded that Alden Leeds had violated Sections 8(a)(1) and (3) of the Act by locking out its employees on November 3, 2009, without providing its employees with a timely, clear, and complete offer setting forth the conditions necessary to avoid the lockout. *Alden Leeds, Inc.*, 357 N.L.R.B. No. 20, at 10-13. The ALJ noted that the Company's October 30 email purporting to detail the terms of its offer was confusing, incomplete, and internally inconsistent, and that both Cunningham and Troccoli were confused about which health care plan, if any, the Company was proposing. *Id.* at 11. The ALJ found that the Company first submitted a complete proposal to the Union on November 9, 2009. *Id.* at 12. The ALJ found, however, that this proposal did not cure the Company's failure to provide a complete proposal prior to the lockout, and that the lockout, unlawful at its inception, retained its initial taint of illegality until it was terminated and the affected employees were made whole. *Id.* The ALJ recommended that the Company should cease and desist from illegally locking out its employees, reinstate the unlawfully locked out employees, and provide the unlawfully locked out employees full backpay. *Id.* at 13.

On July 19, 2011, the Board substantially adopted the ALJ's findings and his recommended order. *Id.* at 1. The Board added the following explanation to its judgment:

We agree with the [ALJ], for the reasons he states, that the lockout's initial illegality was not cured when the Respondent provided the Union with a complete contract proposal on November 9, 2009, almost 1 week after the lockout began. The [ALJ] specifically so found and the [Company] has not argued in its exceptions or brief in support that the judge erred in so finding. Moreover, it is well established that "a lockout unlawful at its inception retains its initial taint of illegality until it is terminated and the affected employees are made whole." *Movers and Warehousemen's Assn. of Washington DC*, 224 NLRB 356, 357 (1976), enfd. 550 F.2d 962 (4th Cir. 1977), cert. denied 434 U.S. 826 (1977). The Board further held in its decision on the merits in *Movers*, "the burden must be on Respondent to show that its failure to restore the status quo ante had no adverse impact on the subsequent collective bargaining," and that "no such showing has been made." Id. at 358. Here, the [ALJ] did not find that the [Company] has carried its burden in this regard and the [Company] did not except to the absence of such a finding. In these circumstances, further litigation of this matter at compliance is unwarranted.

*Id.* at 1 n.3. One member of the Board indicated that he would have allowed the Company to litigate its backpay liability at a compliance proceeding even though Alden Leeds had failed to raise a specific exception to the ALJ's decision on this point. *Id.*

Alden Leeds now petitions for review of the Board's Decision and Order. Specifically, Alden Leeds raises two challenges. First, Alden Leeds argues that the Board erred in adopting the ALJ's finding that the Company violated the Act by failing to provide the Union with a timely, clear, and complete offer setting forth the conditions necessary to avoid

the lockout. Second, Alden Leeds contends that the Board erred in concluding that further litigation of the Company's backpay liability in a compliance proceeding was unwarranted.

## III. DEFERENCE DUE TO THE BOARD'S FINDINGS

It is well established that this court "accords a very high degree of deference to administrative adjudications by the NLRB." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (citation omitted). We review the Board's findings of fact for substantial evidence, which "gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree which *could* satisfy a reasonable factfinder." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998). Credibility determinations made by the ALJ, as adopted by the Board, are accepted unless they are patently insupportable. *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1297 (D.C. Cir. 1988). Furthermore, "[w]hen the Board concludes that a violation of the NLRA has occurred, we must uphold that finding unless it has no rational basis or is unsupported by substantial evidence." *Bally's*, 646 F.3d at 935 (citation omitted). "Indeed, the Board is to be reversed only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Id.* (citation omitted).

Section 8(a)(3) of the NLRA makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Such conduct also violates Section 8(a)(1) of the Act, *id.* § 158(a)(1), which makes it an unfair labor practice "to interfere with, restrain, or

coerce employees in the exercise of rights guaranteed" in the Act. *Laro Maint. Corp. v. NLRB*, 56 F.3d 224, 227 n.3 (D.C. Cir. 1995). An employer may, however, lawfully lock out its employees for "the sole purpose of bringing economic pressure to bear in support of [its] legitimate bargaining position." *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318 (1965). In order for such a lockout to be lawful, the employer must inform the union in a clear and timely manner of its demands so that the union has a fair opportunity to evaluate whether to accept the employer's proposal and avoid a lockout. *Dayton Newspapers, Inc.*, 339 N.L.R.B. 650, 656 (2003), *enforced in relevant part* 402 F.3d 651 (6th Cir. 2005); *see also Dietrich Indus., Inc.*, 353 N.L.R.B. 57, 60 (2008).

Alden Leeds argues that its October 30, 2009, email was clear, and that the record is replete with evidence that the Company's negotiating position remained unchanged throughout the entire period leading up to, and including, the lockout. According to Alden Leeds, the record demonstrates that the Union knew and understood that the Company was offering a one-year freeze on all terms of the existing agreement, including the cost of employee health care. On this view of the record, the Company argues that the Board had no grounds to support its determination that Alden Leeds violated the Act. We disagree.

Reviewing the record as a whole, it is clear that the Board's judgment in this case is supported by substantial evidence. In considering the Company's October 30, 2009, email to the Union – the last communication sent from the Company to the Union before the lockout – a reasonable factfinder could conclude that the Company's proposal to the Union regarding health care was unclear. *See Allentown Mack Sales*, 522 U.S. at 377. The email fails to illuminate whether

the Company was proposing any or all of its various alternative health care plans, which differed from the existing health care plan under the 2005 collective bargaining agreement. Furthermore, the ALJ credited the testimony of both Cunningham and Troccoli that the Union was confused about which health care plan, if any, the Company was proposing in its October 30 email. We must accept these credibility determinations, as nothing in the record suggests that they are "patently insupportable." *See Creative Food Design*, 852 F.2d at 1297.

Although Alden Leeds argues that the record contains evidence that is contrary to the Board's findings and supports its position, "[t]he question before us is not whether substantial evidence supports the [Company's] view, but whether it supports the Board's." *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 352 (D.C. Cir. 2011). The Board's judgment in this case easily commands the deference of this court under the controlling standards of review.

## IV.  THE SECTION 10(E) ISSUE

"[A] lockout unlawful at its inception retains its initial taint of illegality until it is terminated and the affected employees are made whole." *Movers & Warehousemen's Ass'n of Metro. Wash., D.C., Inc.*, 224 N.L.R.B. 356, 357 (1976), *enforced* 550 F.2d 962 (4th Cir. 1977). In other words, to cure a lockout, the employer must restore the status quo ante as well as end the lockout. *See Greensburg Coca-Cola Bottling Co.*, 311 N.L.R.B. 1022, 1029 (1993), *enforcement denied on other grounds*, 40 F.3d 669 (3d Cir. 1994). Nevertheless, "an employer can avoid further liability if it is able to show affirmatively that a failure to restore the status quo ante did not adversely affect subsequent bargaining." *Id.*

Alden Leeds contends that the Board erred in refusing to permit the Company to litigate the scope of its backpay liability in a compliance proceeding. In particular, the Company argues that it should be afforded an opportunity to establish in a compliance proceeding that its backpay liability ended on November 9. We lack jurisdiction to consider this challenge, however, because Alden Leeds failed to raise this claim with the Board, as required by the Act.

Section 10(e) of the NLRA provides that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). The Board's regulation interpreting this provision requires parties to "set forth specifically the questions of procedure, fact, law, or policy to which exception is taken" and "concisely state the grounds for the exception." 29 C.F.R. § 102.46(b)(1); *see also id.* § 102.46(b)(2) ("Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged shall be deemed to have been waived."). "And it is long established that where a petitioner objects to a finding on an issue first raised in the Board's decision, a petitioner must file for reconsideration to afford the Board an opportunity to correct the error, if any." *Nova Se. Univ. v. NLRB*, 807 F.3d 308, 313 (D.C. Cir. 2015) (citing *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982)).

It is undisputed that Alden Leeds failed to raise its claim with the Board as required by Section 10(e) of the Act. Once the ALJ found that the Company's November 9, 2009, offer did not cure the lockout, and instead found that the lockout retained its initial taint of illegality until the Company terminated the lockout and made its employees whole, Alden

Leeds was obligated to challenge that finding in its exceptions to the Board in order to preserve the issue for judicial review. *See Nova Se. Univ.*, 807 F.3d at 313 (dismissing challenge under Section 10(e) where petitioner failed to file proper exception); *Spectrum Health-Kent Cmty. Campus v. NLRB*, 647 F.3d 341, 348-50 (D.C. Cir. 2011) (same). But as the Board found and the Company concedes, Alden Leeds failed to raise and preserve its objection. *See Alden Leeds, Inc.*, 357 N.L.R.B. No. 20, at 1 n.3; Br. of Petitioner at 50 ("The question of the scope of the Company's backpay liability . . . was not the subject of a specific exception made to the NLRB below."). Accordingly, we lack jurisdiction under Section 10(e) to consider the Company's challenge.

In an attempt to escape this conclusion, Alden Leeds presses several arguments, none of which is persuasive. First, the Company contends that under *Greensburg Coca-Cola Bottling Co.*, 311 N.L.R.B. 1022 (1993), cited by the dissenting Board member, the scope of the Company's backpay liability should be reserved for the compliance stage of the Board's proceedings, despite the fact that Alden Leeds did not raise this issue before the Board during the unfair labor practice proceedings. *See* Br. of Petitioner at 47-52. But as the majority of the Board correctly pointed out, *Greensburg Coca-Cola* does not support the Company's position. In *Greensburg Coca-Cola*, the ALJ explicitly deferred the backpay issue of whether the lockout was cured or retained its initial taint of illegality to a future compliance proceeding, 311 N.L.R.B. at 1028-29, and neither party filed an exception to that portion of the ALJ's decision. Thus, the jurisdictional bar of Section 10(e) was not at issue. In the present case, in contrast, the ALJ explicitly ruled that the lockout was not cured and retained its initial taint of illegality until the Union's employees were made whole, but Alden Leeds never objected to this finding. *Greensburg Coca-Cola*

thus presents no justification to disturb the application of Section 10(e)'s jurisdictional bar in the present case.

Second, relying on *Trump Plaza Associates v. NLRB*, 679 F.3d 822 (D.C. Cir. 2012), Alden Leeds argues that the jurisdictional bar of Section 10(e) does not apply in this case because the Board was "sufficiently appraised" of the issue that Alden Leeds now seeks to raise. Therefore, according to the Company, it would have been an "empty formality" to raise the matter with the Board in the first instance. Reply Br. of Petitioner at 22-24. We reject this argument.

In *Trump Plaza*, the court found that the substance of the petitioner's challenge was encompassed in its other exceptions filed with the Board. Therefore, the court determined that Section 10(e) was not a bar to the petitioner's challenge, despite the petitioner's failure to specifically object before the Board. *Trump Plaza*, 679 F.3d at 830. Unlike in *Trump Plaza*, Alden Leeds never put before the Board, in any manner, the argument that it now advances – that Alden Leeds should be able to contest the scope of its backpay liability at a compliance proceeding. Not only did Alden Leeds fail to make this argument in a specific exception filed before the Board, but none of the other exceptions filed by Alden Leeds encompassed the substance of this challenge. Indeed, Alden Leeds has never even argued that its other exceptions encompassed its backpay challenge. *Trump Plaza* therefore provides the Company with no relief. *See id.*; *see also Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 417-18 (D.C. Cir. 1996) (finding vague exception insufficient to provide Board with required notice of ground for petitioner's challenge).

Finally, Alden Leeds argues that Section 10(e) should not apply in this case because the Board discussed the backpay

issue on its own initiative, the issue has been briefed by the parties, and the issue involves an undecided question of law. *See* Br. of Petitioner at 51-52. These points cannot carry the day. The Company attempts to frame these circumstances as "extraordinary," sufficient to confer jurisdiction on the court to address the issue. *See* Reply Br. at 24-28. The Company's position, however, finds no support in the law. "[S]ection 10(e) bars review of any issue not *presented* to the Board, even where the Board has discussed and decided the issue." *HealthBridge Mgmt., LLC v. NLRB*, 798 F.3d 1059, 1069 (D.C. Cir. 2015) (quoting *Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 143 (D.C. Cir. 1999)). Furthermore, Section 10(e) applies "regardless of whether the questions raised be considered questions of law, questions of fact, or mixed questions of fact and law." *P.R. Drydock & Marine Terminals, Inc. v. NLRB*, 284 F.2d 212, 215-16 (D.C. Cir. 1960).

## V. CONCLUSION

For the reasons set forth above, we hereby deny the petition for review and grant the cross-petition for enforcement.

*So ordered.*