# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 6, 2018                          May 18, 2018

No. 16-1370

PRIME HEALTHCARE SERVICES - ENCINO LLC, D/B/A ENCINO
HOSPITAL MEDICAL CENTER
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

SEIU LOCAL 121RN,
INTERVENOR

———

Consolidated with 16-1423

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Jamie M. Konn* argued the cause for petitioner. With him on the brief were *Joseph A. Turzi* and *Jonathan S. Batten*.

*Gregoire Sauter*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy

Associate General Counsel, and *Kira Dellinger Vol*, Supervisory Attorney.

   *Lisa C. Demidovich* argued the cause for intervenor SEIU Local 121RN.  With her on the brief was *Ira L. Gottlieb*.

   Before: GRIFFITH and PILLARD, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

   Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

   EDWARDS, *Senior Circuit Judge*: The National Labor Relations Act ("Act" or "NLRA") imposes on employers a general duty to bargain in good faith with their employees' representatives over "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(a)(5), (d). Pursuant to this duty to bargain, "an employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991) (citing *NLRB v. Katz*, 369 U.S. 736 (1962)). This "[unilateral change] doctrine has been extended as well to cases where . . . an existing agreement has expired and negotiations on a new one have yet to be completed." *Id*. The duty to bargain also requires an employer "to provide relevant information needed by a labor union for the proper performance of its duties as the employees' bargaining representative." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303 (1979). A failure to comply with either obligation is a violation of Section 8(a)(5) and (1) of the Act. 29 U.S.C. § 158(a)(5), (1).

   In this case, the National Labor Relations Board ("Board") found that the Petitioner, Prime Healthcare Services and its subsidiary hospitals (together "Prime"), violated both the

unilateral change doctrine and the duty to provide relevant information during negotiations with its employees' bargaining representatives, Service Employees International Union ("SEIU") Local 121RN ("121RN") and SEIU United Healthcare Workers-West ("UHW") (collectively, "the Unions"). *Prime Healthcare Servs.*, 364 NLRB No. 128, slip op. at 1–3 (Oct. 17, 2016). The Board concluded that Prime unilaterally discontinued anniversary step increases due to unit employees after its collective bargaining agreements with 121RN and UHW had expired. *Id.* at 10. The Board also determined that Prime wrongfully refused to provide information about employee health care programs in response to requests from 121RN and UHW. *Id.* at 13, 16. The Board ordered Prime to, *inter alia*, resume granting step increases to eligible employees; make whole eligible employees for any loss of earnings resulting from the employer's failure to grant anniversary step increases; and furnish 121RN and UHW the requested information. *Id.* at 2–3.

After the parties filed their opening briefs, the complaints relating to UHW's unfair labor practice charges were settled. The only matters that are still in issue here are those relating to the unfair labor practice charges filed by 121RN. Prime has raised a number of challenges to the Board's disposition of the 121RN charges. We find no merit in these challenges, however. Accordingly, we deny the petition for review and grant the Board's cross-application for enforcement of its order.

## I.    BACKGROUND

Prime Healthcare Services, Inc., and its affiliate Prime Healthcare Foundation, Inc., own and operate numerous hospitals in various states. In June 2008, Prime acquired two hospitals in California—Encino Hospital Medical Center ("Encino") and Garden Grove Hospital & Medical Center

("Garden Grove"). It adopted three collective bargaining agreements then in force between the hospitals' prior owner and their employees. The first agreement was with 121RN, a union representing a unit of registered nurses at Encino. The second and third agreements were with UHW, a union representing two units of service and technical employees at Encino and Garden Grove. All three agreements were effective from January 1, 2007, through March 31, 2011.

## A. *Negotiations Over New Collective Bargaining Agreements*

In late 2010 and early 2011, Prime commenced negotiations with 121RN and UHW over new collective bargaining agreements. Although the Unions represented different bargaining units, both are affiliated with the Service Employees International Union. Mary Schottmiller was the hospitals' principal representative in the negotiations with 121RN and UHW. The existing contracts covering all three units expired on March 31, 2011, without the parties having reached any new agreements.

In addition to serving as the bargaining agent for employees at Prime, UHW also represented employees at hospitals owned by Kaiser and was a member of the National Coalition of Kaiser-Permanente Unions. Kaiser and the union coalition had reached an arrangement in 1997 pursuant to which the unions agreed to assist Kaiser in maintaining and improving its position in the marketplace. Part of the agreement required the unions to "focus . . . on real external threats" to Kaiser, including "competition." *Prime Healthcare Servs.*, 364 NLRB No. 128, slip op. at 6. Prime is among Kaiser's competitors. During the course of the negotiations between Prime and UHW, officials at Prime expressed concerns that bargaining between Prime and UHW had been compromised because of the Union's relationship with Kaiser.

In 2010, UHW conducted a "corporate accountability campaign" against Prime. *Id.* at 7. It publicized labor disputes with a Prime facility and criticized the company for reducing wages and benefits, and limiting access to medical care. It also published several reports questioning the quality of care provided at Prime hospitals, including allegations of unusually high rates of septicemia among Medicare patients.

UHW's corporate accountability campaign caused officials at Prime to suspect that the Union might be working with Kaiser to exclude Prime from the California health care market. Nonetheless, Prime continued to pursue collective bargaining negotiations with both UHW and 121RN throughout 2011.

## B. Anniversary Step Increases

The UHW and 121RN collective bargaining agreements in force at the time when Prime acquired the hospitals contained identical provisions covering wage increases for unit employees. One provision granted annual increases on specific dates each year when the contract was in effect, from 2007 to 2010. Another provision granted step increases on the anniversary of an employee's hiring date. The contracts further capped unit employees' total wage increases to no greater than 9.25% in any twelve-month period. The relevant provisions read as follows:

3. Annual Hospital Wide Increases:

All members of the bargaining unit shall receive the following increases . . . [setting forth specific increases to take effect at contract ratification, on July 1, 2008, July 1, 2009, and July 1, 2010] . . . . No bargaining unit

member will receive a wage increase greater than 9.25% in any twelve (12) month period. . . .

5. Annual Increases/Advancing Through the Steps:

In addition to the above hospital-wide annual increases, beginning July 1, 2008, individual employees shall receive Anniversary Step Increases in accordance with the wage scales in the following manner:

. . . Employees who are at or below the scale on the anniversary date of their most recent date of hire shall advance to the next step on the wage scale on that anniversary date, subject to the annual caps provided in Section 3 above, which limit the maximum increase any employee may receive in any twelve (12) month period. Employees . . . who are less than one full step above scale shall advance to the next step on their anniversary date, again subject to the annual caps provided in Section 3 above.

Joint Appendix ("J.A.") 151–53.

At the parties' first bargaining session after the contracts had expired, Schottmiller agreed with the Unions' representatives that the employees' anniversary step increases under Section 5 would continue. For several months, Encino continued to approve anniversary step increases for eligible employees in the 121RN unit without any issues. In late 2011, however, Schottmiller decided that the step increases under Section 5 did not survive the contract expiration because Section 5 referred to Section 3 and the annual increases under Section 3 concededly did not extend beyond the expiration of the contracts. In November 2011, Encino discontinued paying

step increases to unit employees. The Unions then filed unfair labor practice charges with the Board.

C.  *Union Information Requests*

On January 1, 2010, the employees represented by UHW and 121RN began to receive health care benefits under Prime's exclusive provider organization ("EPO") and preferred provider organization ("PPO") medical plans. Under the EPO plan, employees could obtain services at Prime facilities or from doctors affiliated with Prime hospitals under a fee-for-service arrangement. Under the PPO plan, employees could join outside insurance networks.

121RN anticipated that Prime would seek to implement significant changes to health care benefits under the new collective bargaining agreements, including increases in employee copays, deductibles, and premiums. Therefore, in April 2011, 121RN's research director submitted a written request to Schottmiller for certain information relating to the EPO and PPO plans. Specifically, she requested information about employer costs for care, employee access to care, and the quality of care at Prime facilities, including lists of in-patient discharges organized by Medicare diagnostic code. The request explained that the Union needed the information to prepare its bargaining proposals.

Schottmiller responded to the 121RN request by letter, seeking information from 121RN regarding the Union's planned proposals and how the requested information was relevant to them. She noted that Encino was "not agreeable to any health care plan other than the EPO and PPO plans already implemented and agreed to" and was "not inclined to change . . . coverage regardless of the cost issues that you raise." J.A. 213–14. Schottmiller's letter also contested the relevance of the

information about employees' access to care in the Prime facilities.

The parties subsequently exchanged a series of letters. 121RN explained to Prime that the Union had not yet determined what proposals it would make regarding the existing health plans and stated that it sought the information to facilitate its consideration of bargaining proposals. The Union described why the requested information was necessary to evaluate the existing plans and determine whether to propose changes. Schottmiller continued to refuse to provide the requested information, rejecting the Union's explanations as "conclusory," J.A. 219, asserting that the information sought appeared to violate the collective bargaining privilege, *id.*, and accusing the Union of "engag[ing] in a fishing expedition in an attempt to create a problem where none exists," J.A. 225.

During the same period, UHW submitted an information request similar to 121RN's and Schottmiller refused to provide the requested data. Both Unions filed unfair labor practice charges with the Board in September 2011. While those charges were pending, the parties continued to bargain over health care. Encino proposed continuing the current plans with an increase in employee premiums. 121RN, in turn, raised concerns about cost, access, and quality of care under Encino's proposal.

## D. *Procedural History*

The Board's Acting General Counsel investigated the Unions' unfair labor practice charges and issued a consolidated complaint against Prime on January 31, 2013. The complaint alleged that Prime had violated Section 8(a)(5) and (1) of the Act by ceasing to grant step increases and by failing to furnish relevant, necessary information requested by the Unions.

Following a hearing, an Administrative Law Judge ("ALJ") issued a recommended decision and order finding that Prime had violated the Act.

On October 17, 2016, the Board issued a Decision and Order adopting the ALJ's findings and conclusions. *Prime Healthcare Servs.*, 364 NLRB No. 128, slip op. at 1. It directed Prime to furnish the information requested by the Unions, resume granting step increases to eligible employees, compensate employees for their losses, post a remedial notice, and cease and desist from refusing to bargain in good faith with the Unions. *Id.* at 1–3.

Prime filed a petition for review with this court on October 27, 2016. It challenged the Board's findings and asserted that UHW's charges should have been dismissed because the Union had a disabling conflict of interest. The NLRB filed a cross-application for enforcement of its order, the Unions intervened, and the cases were consolidated.

After the parties filed their opening briefs, Encino, Garden Grove, and UHW reached a settlement with the Board. Those parties filed a motion with the court seeking severance and dismissal of the portion of the consolidated proceeding stemming from UHW's charges. On July 11, 2017, the court granted the motion. The only claims now remaining for our review are those involving Encino and 121RN.

## II. ANALYSIS

### A. Standard of Review

Our review of the Board's judgment is limited. *Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 372 (D.C. Cir. 2017). We will overturn the Board's decision only if,

"reviewing the record as a whole, it appears that the Board's factual findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts at issue." *S. Nuclear Operating Co. v. NLRB*, 524 F.3d 1350, 1355 (D.C. Cir. 2008).

Although the Board is authorized to interpret a collective bargaining agreement to resolve unfair labor practice charges, we owe "no deference to the Board's interpretation." *NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 837 (D.C. Cir. 1993). We therefore interpret the collective bargaining agreement between 121RN and Encino *de novo*. *See Wilkes-Barre*, 857 F.3d at 373.

## B. Unilateral Cessation of Wage Increases

Under the unilateral change doctrine, an employer may not change a term or condition of employment unless the employer and the employees' bargaining agent reach a new agreement or bargain to impasse. As we explained in *Honeywell International, Inc. v. NRLB*, 253 F.3d 125 (D.C. Cir. 2001),

> the . . . doctrine is premised on a *statutory* right. . . . The right may be waived by contract and it may be vitiated if the parties reach an impasse in collective bargaining. And it applies only with respect to mandatory subjects of bargaining, excluding certain categorical exceptions recognized by the courts and the Board. *See, e.g., Litton*, 501 U.S. at 199–200[;] *Acme Die Casting v. NLRB*, 93 F.3d 854, 857 (D.C. Cir. 1996). Beyond these conditions, however, the [unilateral change doctrine] is an inviolate principle of collective bargaining.

*Id.* at 131.

Prime does not dispute that an anniversary step increase provision is a mandatory subject of bargaining and that it was an established term of employment under the agreement covering the employees represented by 121RN. And Prime does not claim that the parties reached an impasse in negotiations over the anniversary step increase provision, that the parties executed a new agreement on the subject, or that the Union waived its right to bargain over the subject. Rather, Prime contends that the anniversary step increase provision terminated with the expiration of the parties' collective bargaining agreement. In support of this position, Prime argues as follows: anniversary step increases were inexorably tied to annual increases under the parties' expired agreement; annual increases indisputably terminated with the expiration of the agreement; therefore, step increases terminated as well. We disagree.

"To avoid running afoul of the unilateral change doctrine, an employer must maintain the status quo as to terms and conditions of employment after the expiration of a collective bargaining agreement." *Wilkes-Barre*, 857 F.3d at 373–74. It is well established that, pursuant to the duty to bargain under the NLRA, many terms of an expired collective bargaining agreement extend beyond the contract's termination date and continue to "define the *status quo*." *Litton*, 501 U.S. at 206. Therefore, in order to determine whether Prime violated its duty to bargain in this case, we must determine whether the disputed step increase provision was a part of the *status quo*. And to do this, "we look to the substantive terms" of the expired collective bargain agreement. *Wilkes-Barre*, 857 F.3d at 374.

As noted above, Prime contends that step increases under Section 5 of the parties' expired contract were "inexorably linked" to the annual increases under Section 3, because

Section 5 referenced the total increase cap under Section 3. Pet'r Reply Br. 4. This argument is unconvincing. The step increase provision in Section 5 did not by its terms provide for the cessation of the benefit at the expiration of the agreement. Employees' anniversary dates continue for as long as they are with the employer. By contrast, it is clear from the terms of the annual increase provision under Section 3 that such increases were due only in the years indicated in the contract.

In the absence of language in the collective bargaining agreement providing otherwise, anniversary step increases are part of the *status quo* and continue post-expiration. Furthermore, anniversary step increases and annual increases are "distinct rights that operate independently of each other." *Wilkes-Barre*, 857 F.3d at 377. Thus, language tying annual increases to the term of the contract has no bearing on whether the anniversary step increases also expired. *Wilkes-Barre* instead instructs us to assess each contractual provision on its own terms. Where one of two wage increase provisions in a collective bargaining agreement includes explicit language making clear that it will not continue as part of the *status quo* post-expiration, and the other increase provision in the contract does not include such explicit language, the second increase provision remains part of the *status quo* and is subject to the unilateral change doctrine. Under this rule, only the Section 3 increases terminated with the contract. Prime's Section 5 obligations continued as part of the *status quo* after the agreement expired.

Nothing in the agreement between Encino and 121RN limited the duration of the anniversary step increases. Section 3 provided for annual increases to take effect on four specific dates prior to the expiration of the contract. J.A. 151–52. Section 5, in turn, provided for step increases to occur on the anniversary date of an employee's hiring "beginning July 1,

2008." J.A. 152. Unlike Section 3, Section 5 provided no date certain for the increases to end. In these circumstances, our decision in *Wilkes-Barre* is controlling, and Prime's attempts to distinguish that decision are unavailing.

It is also noteworthy that Section 5 of the parties' agreement referred to Section 3 to indicate only that the step increases would be provided "[i]n addition" to the Section 3 annual increases and that step increases were subject to a 9.25% total annual increase cap. J.A. 152. The clear implication of these contract terms was that anniversary step increases would be due (subject to the cap) without regard to whether an employee received an annual increase. The cap on the total increase level in a 12-month period merely indicated the maximum increase that an employee could receive in a year, not whether step increases would continue after the expiration of the agreement. As in *Wilkes-Barre*, the disputed wage increase provisions in this case were plainly "distinct" and "operate[d] independently of each other." 857 F.3d at 377.

On the record at hand, we agree with the Board that Prime breached its duty to bargain when it unilaterally terminated employee anniversary step increases after the expiration of the parties' agreement.

## C. *Refusal to Provide Requested Information*

Prime also challenges the Board's determination that Encino was required to provide 121RN with the information it requested. Because the Board's decision was consistent with established precedent and is supported by substantial evidence, we have no cause to disturb it.

An employer's statutory duty to bargain in good faith "includes a duty to provide relevant information needed by a

labor union for the proper performance of its duties." *Detroit Edison Co.*, 440 U.S. at 303. Refusing to provide relevant information upon request is a violation of the Act. *Country Ford Trucks, Inc. v. NLRB*, 229 F.3d 1184, 1191 (D.C. Cir. 2000). Information related to employee benefits is presumptively relevant, *id.*, and an employer must produce presumptively relevant information unless it rebuts the presumption or asserts a valid countervailing interest, *see Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*, 711 F.2d 348, 359–60 (D.C. Cir. 1983). In order to withhold presumptively relevant information, an employer must "prove either lack of relevance or . . . provide adequate reasons why it cannot, in good faith, supply the information." *Hondo, Inc.*, 311 NLRB 424, 425 (1993).

Prime first contends that the information 121RN requested was "facially irrelevant" to bargaining and, therefore, the hospital had no duty to produce it. Pet'r Reply Br. 9. According to Prime, because Encino had made clear that it was not going to purchase insurance from a competitor regardless of what cost issues the Union raised, cost of care was not at issue. This is a specious claim. Prime's preference to provide health care itself surely did not nullify the Union's right to bargain over the subject. *See Katz*, 369 U.S. at 743 ("A refusal to negotiate . . . as to any subject which is within § 8(d) . . . violates § 8(a)(5)."). Health care benefits are a mandatory subject of bargaining. *Oak Harbor Freight Lines, Inc. v. NLRB*, 855 F.3d 436, 438 (D.C. Cir. 2017). Therefore, the Union had a right to seek the relevant data. *See Oil, Chem. & Atomic Workers*, 711 F.2d at 359. Indeed, in this case, Prime put the issue of cost in play when, during contract negotiations, it raised the possibility of increasing health care costs for the employees. *See* J.A. 815–16. In any event, it appears that Prime abandoned this argument before the Board. *See Prime Healthcare Servs.*, 364 NLRB No. 128, slip op. at 13, n.25. Therefore, we need not address it for

lack of jurisdiction. *See* 29 U.S.C. § 160(e); *Alden Leeds, Inc. v. NLRB*, 812 F.3d 159, 166–67 (D.C. Cir. 2016).

Prime also contends that even if the requested information was presumptively relevant, the presumption of relevance was rebutted by Encino's concern that 121RN's requests for information were for illegitimate purposes. Encino points out that 121RN sought the same type of coding information that UHW had requested. And, as noted above, Encino was concerned that UHW's requests were improper in light of UHW's relationship with Kaiser. Relying on the Board's opinion in *Hondo, Inc.*, 311 NLRB 424, Prime claims that, given its legitimate competitive concerns, the Union was obliged to better explain its need for the disputed information.

In *Hondo, Inc.*, the Board held that, where it was obvious that a union was seeking information for an improper purpose, the union was required to "do more than provide general avowals of relevance in order to establish its need for the information." *Id.* at 426. In such a situation, the union was obligated to "articulate how it would use the information to fulfill its duties." *Id.* Prime contends that, because it raised legitimate concerns about the Union's purpose in making the information requests at issue in this case, the Union was required to demonstrate more precisely the relevance of the data that it sought. Prime asserts that the Union's explanations were too conclusory to meet the standard enunciated in *Hondo, Inc.*

In rejecting Prime's claims, the Board adopted the ALJ's finding that "[t]here was nothing unusual about [121RN]'s request for information," and "the mere fact that UHW had used similar . . . data to issue critical reports about Prime was insufficient to rebut [the] presumption [that the union acts in good faith in requesting information] or justify [Prime's]

failure to provide the information to 121RN." *Prime Healthcare Servs.*, 364 NLRB No. 128, slip op. at 13–14. Accordingly, the Board concluded that 121RN had no duty to provide any further explanation to justify the relevance of its information requests. *Id.* at 13.

The Board's conclusion is perfectly consistent with established precedent, and it is supported by substantial evidence in the record. The disputed information pertained to the costs and quality of care at Prime facilities, which were "obviously relevant given that the employees were required under the Prime EPO plan to obtain medical treatment at Prime facilities," *id.*, and because the health plans were a likely subject of bargaining. Like 121RN, UHW was in the midst of negotiations with the hospital about health care issues. The Board thus reasonably concluded that the mere similarity in the information requested by the two Unions was insufficient to rebut the presumption that the information was relevant to bargaining, or to suggest that it was requested for an improper purpose. *See DaimlerChrysler Corp. v. NLRB*, 288 F.3d 434, 443 (D.C. Cir. 2002) (noting that relevant information requests are presumed to have been made in good faith "until the company demonstrates otherwise"); *Country Ford Trucks*, 229 F.3d at 1192 (explaining that "[v]ague allegations of a union's bad faith" do not affect the employer's obligation to turn over presumptively relevant information). Therefore, Prime had a statutory duty to comply with 121RN's requests.

Finally, Prime vaguely suggests that the disputed cost-of-care information might be privileged, confidential financial information. Pet'r Br. 49. However, Prime did not expressly press this argument in response to 121RN's (as distinguished from UHW's) requests for information. Therefore, Prime's passing references to "privilege" and "proprietary information," *id.*, are insufficient to merit our review. *See Am.*

*Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (collecting cases in which this court has refused to consider arguments only cursorily mentioned in the briefs).

Moreover, if the information was somehow privileged or confidential, Prime would have been required to provide the Union with a reasonable accommodation to ensure it received the information it needed to perform its duties. *See, e.g.*, *U.S. Testing Co., Inc. v. NLRB*, 160 F.3d 14, 20–21 (D.C. Cir. 1998); *Tritac Corp.*, 286 NLRB 522, 522 (1987). Therefore, we reject Prime's challenge to the Board's determination regarding the requested information.

## III.  CONCLUSION

For the reasons explained above, we hereby deny the petition for review and grant the Board's cross-application for enforcement of its order.

*So ordered.*